IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DORIS S. BATTLE,

      Plaintiff,

v.                                No. 10-1024

HAYWOOD COUNTY BOARD OF
EDUCATION,

      Defendant.
_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

The Plaintiff, Doris S. Battle, brought this action against the Defendant, Haywood County,

Tennessee Board of Education (the "Board"), on February 1, 2010 alleging violations of 42 U.S.C.

§§ 1981, 1983 and 2000e, violation of the Tennessee Human Rights Act, Tennessee Code Annotated

§ 4-21-101, *et seq.* ("THRA"), and common law retaliation.  Before the Court is the Defendant's

motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To survive summary judgment, the

nonmoving party must come forward with specific facts showing that there is a genuine issue for

trial." Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (quoting Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))

(internal quotation marks omitted).  "A genuine issue of material fact exists if a reasonable juror

could return a verdict for the nonmoving party." Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." American Civil Liberties Union of Ky. v. Grayson Cnty., Ky., 591 F.3d 837, 843 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. 1348), reh'g denied, 605 F.3d 426 (May 14, 2010). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

*FACTS*

The facts construed in the light most favorable to the nonmoving party are as follows. The Board is a governmental entity responsible for oversight and control of the Haywood County school system. (Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 2.) Battle was hired by the Defendant in 1983 as a kindergarten teacher at East Side Elementary School in Brownsville, Tennessee. (Compl. ¶ 10; Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. I (Resume of Doris S. Battle).) Over the years, she was promoted to the positions of assistant principal, principal, assistant director of schools and interim director of schools, where she remained until her resignation in 2008. (Compl. ¶ 10.) The Plaintiff became assistant director of schools in 1997. (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. I (Resume of Doris S. Battle).) In that capacity, she worked under director of schools George Chapman from 2000 until his retirement in April 2008. (Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 3.)

On April 28, 2008, the Board was comprised of Chairperson Patricia Gruenewald and

members Harold Garrett, Joe Barden IV, Pearlie Hess and Robbie King. (Def.'s Mot. for Summ. J., Ex. A (Minutes of Bd. Mtg. Apr. 28, 2008).) At a Board meeting on that date, a motion was passed to accept Chapman's retirement as of August 26, 2008. (Id.)

Board policy listed certain qualifications for the director of schools: a professional educator's license, a master's degree in education with preference for a doctorate degree, three years of successful experience in school administration and "[s]uch other qualifications as the Board deems desirable." (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. G (Bd. Policy No. 5.802.).) The Board also had a policy with respect to recruitment and selection of the director of schools, issued April 8, 2008, which provided as follows:

> When a vacancy occurs, the appointment of a director of schools is a function of the Board. The Board is responsible for finding the person it believes can most effectively translate into action the policies of the Board and the goals of the community and the professional staff.
>
> The Board may employ a consultant to advise and assist the Board in the search and selection process. However, a final selection shall rest with the Board after a thorough consideration of qualified applicants. An interim director of schools appointed during the time of a search shall not become a candidate unless the Board expressly permits such inclusion in the selection procedures. A board member may not apply or in any other way be considered for the position of director of schools.
>
> Prior to conducting a search to fill the position, the Board shall initially develop the following:
>
> • a job description
> • a timeline
> • a process for accepting and reviewing applications
> • selection procedures which shall include, but not be limited to, the following:
>
> 1. The Board may invite the community, including board employees, to participate in the process of selecting a director of schools. Resumes of persons interviewed by the Board shall be available in the central office for public inspection.
>
> 2. The interview process for each finalist shall include meetings with

3

> various staff and community groups and an interview with the entire
> board.
>
> 3.    Candidates shall be interviewed by the Board in an open session.
> Only board members will be allowed to ask questions during the
> interview.
>
> 4.    The Board will attempt to select a director by unanimous vote, but a
> two-thirds vote of the membership of the board shall be required for
> the appointment of a director of schools.

(Def.'s Mot. for Summ. J., Ex. C (Bd. Policy No. 5.801.).) (internal footnotes omitted).

A motion was also approved at the April 28, 2008 meeting to run advertisements for Chapman's replacement in local newspapers, including the Brownsville States Graphic, the Jackson[, Tennessee] Sun and the Memphis, Tennessee Commercial Appeal. (Def.'s Mot. for Summ. J., Ex. A (Minutes of Bd. Mtg. Apr. 28, 2008).) In a May 6, 2008 Board meeting, Garrett moved to hire the Tennessee Schools Boards Association ("TSBA" or the "Association") to conduct a search for a new director at a cost of $8,500. (Id., Ex. B (Minutes of Bd. Mtg. May 6, 2008).) The motion failed. (Id., Ex. B) According to its executive director, Tammy Grissom, TSBA is a non-profit private service organization which school boards in the state of Tennessee may voluntarily join. (Id., Ex. 36 (Dep. of Tammy Grissom ("Grissom Dep.")) at 6-7.) Upon the payment of dues, members have access to legislative, policy, superintendent search and superintendent evaluation services, as well as labor relations information, meetings, workshops, board retreats and board evaluations. (Id. at 7.)

When a school board makes a request for assistance in locating a director of schools, the Association first conducts a series of community meetings in order to gather the input of principals, teachers, parents, county commissions, mayors, business officials and other interested persons on three questions: (1) "[w]hat are the good things that are going on in this county that you would like

to see continued;" (2) "what are the problems or challenges a new director will face coming into the system;" and (3) "what are the personal characteristics you would like to see in a new director." (Id. at 8-10.) Forms are distributed listing some twenty-seven personal characteristics and participants are asked to rank them in importance. (Id. at 10.) In these meetings, members of the community are free to recommend candidates for the position. (Id. at 9.)

The Association then compiles an interim report summarizing the rankings and participants' comments. (Id. at 10, 19-20.) The report is used to develop a set of proposed criteria for selecting a new director to be reviewed by the local board, which may accept, reject or modify it. (Id. at 10-11.) After a criteria is adopted, the TSBA advertises the position and sets a timeline for reporting back to the local board regarding finalists. (Id. at 11.) The Association accepts applications, which are screened by a search committee according to the criteria adopted by the local board. (Id.) Unsuccessful applicants are notified by a form letter. (Id. at 29.)

At a May 13, 2008 meeting, Garrett proposed that the Board reconsider enlisting the assistance of TSBA in the hiring of a director of schools. (Def.'s Mot. for Summ. J., Ex. D (Minutes of May 13, 2008 Board meeting).) Robbie King reported to the Board that

> she is receiving calls from citizens in all the districts stating that they are in favor of hiring TSBA to conduct the search for the Director of Schools and that was the bottom line, there should be no hidden agendas, the community has lost confidence in the process and that they could still end up with the same candidate, hates to spend unnecessarily [sic] money, wants the confidence of the new Board, this process keeps the person from being hidden, removes the political agenda, it's a new generation with new ideas, new thoughts, they want to be involved and the Board should respect their constituents and their views.

(Id., Ex. D.) Gruenewald added that

> she was concerned about antagonism, we all love our children, we want the best, whatever decision the Board makes we should come together, the community will not grow if is [sic] bitter and angry, and that during her quiet time she read a quote

5

from Dr. Martin Luther King that she would like to share. The quote reads: "Cowardice asks the question, 'Is it safe?' Expediency asks the question, 'Is it polite?' But conscience asks the question, 'Is it right?' And there comes a time when one must take a position that is neither safe, nor political, nor popular but because conscience tells one it is right."

(Id., Ex. D.) The motion carried. (Def.'s Mot. for Summ. J., Ex. D (Minutes of May 13, 2008 Bd. Mtg.).) It was Garrett's impression that the community wanted "an independent third person out here to be involved in the process, such as TSBA[.]" (Def.'s Mot. for Summ. J., Ex. 29 (Dep. of Harold Garrett ("Garrett Dep.")) at 72.)

Meanwhile, on June 2, 2008, the Board formed a committee consisting of Garrett and Hess to select an interim director of schools. (Id., Ex. E (Minutes of June 2, 2008 Bd. Mtg.).) Both Garrett and Hess acknowledged in their depositions, however, that in years past the assistant director was moved into the interim director's position. (Garrett Dep. at 66; Def.'s Mot. for Summ. J., Ex. 34 (Dep. of Pearlie Hess ("Hess Dep.")) at 6-7.) Garrett recalled that it was Gruenewald's decision to appoint Board members to meet and consider prospective candidates for the interim slot and to recommend a candidate to the Board. (Garrett Dep. at 69-70.) Sometime, but not immediately, after Chapman retired, Garrett approached the district's director of attendance, Peter Agnotti, concerning his interest in the interim position. (Pl.'s Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. Q (Dep. of Peter James Agnotti) at 5-6, 10.) Although he had not expressed an interest to the Board, Agnotti had mentioned to some of his colleagues that he would be interested in the position of assistant director of schools if it became available. (Id. at 10-11.) He remembered Garrett told him he had several individuals in mind for the interim director and asked if could add Agnotti's name to the group to be considered by the Board. (Id. at 11.) According to Garrett, the other persons identified included Gordon Perry, a retired high school principal whose name had been provided to

the committee, and Dr. Susan Scott Wilson, the assistant high school principal, who phoned him and volunteered her services. (Garrett Dep. at 65.) Garrett and Hess met and agreed to recommend Battle to the Board to fill the interim job. (Id. at 67-68; Hess Dep. at 8.)

At a June 2, 2008 meeting, the Board voted to change its policy in order to permit an internal candidate for the director of schools position to return to his or her previous placement in the event he or she was not chosen. (Def.'s Mot. for Summ. J., Ex. E.) This allowed the interim director to apply for the director position. (Id., Ex. E.) During the June 10, 2008 Board meeting, it was noted that "Mr. Garrett said he understood a list of names would be provided, but the previous minutes stated that the committee, Pearlie Hess and Harold Garrett, would present a name." (Id., Ex. F (Minutes of June 10, 2008 Bd. Mtg.).) Garrett then moved to nominate Battle as interim director of schools and the vote was unanimous in favor of the motion. (Id., Ex. F.) Barden had been frustrated that the Board went for some weeks before naming an interim director. (Id., Ex. 31 (Dep. of Joe Barden IV ("Barden Dep.")) at 13.)

Battle accepted the interim position contingent upon a written agreement, which was finalized and approved by the Board on July 8, 2008. (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. T (Minutes of July 8, 2008 Bd. Mtg.).) The contract provided for a term from June 14 through December 31, 2008 and annual compensation of $94,419.00. (Id., Ex. T.) In August 2008, Gruenewald and Barden were replaced on the Board by Daniel Thornton and Allen Currie. (Id., Ex. 33 (Dep. of Patricia Gruenewald ("Gruenewald Dep.")) at 7; Barden Dep. at 6; Def.'s Mot. for Summ. J., Ex. 28 (Dep. of Daniel Thornton ("Thornton Dep.")) at 5; id., Ex. 30 (Dep. of James Allen Currie ("Currie Dep.")) at 5-6.)

Hiring outside assistance in the selection of a director of schools was new for Haywood

County, primarily because TSBA had only recently begun offering the service. (Gruenewald Dep. at 11-12.) It was agreed that up to five candidates would be referred by the Association for the Board's consideration. (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. K (TSBA Final Report) at 4.) However, Grissom advised the Board that she may only have two or three that met its criteria and would not proffer other candidates merely to achieve the agreed upon maximum number. (Def.'s Mot. for Summ. J., Ex. H (Minutes of Sept. 2, 2008 Bd. Mtg.).) TSBA's final report to the Board, which included the finalists' resumes and background, as well as sample interview questions based on the determined criteria, was issued in October 2008. (Grissom Dep. at 13-14.) The final report incorporated Board policy. (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. K (TSBA Final Report) at 4.) At the end of the process, each Board member was to list his or her top two choices on a written ballot. (Id., Ex. K at 4.) The finalist receiving the most votes would be invited for a second interview or be visited by a committee. (Id., Ex. K at 4.) While the TSBA's recommendations are not binding, Grissom estimated that local boards actually deviate from its recommendations less than ten percent of the time. (Grissom Dep. at 30-31, 49.)

According to the Association's interim report, the community input revealed the most important trait of a new director of schools should be that he or she was a good listener. (Def.'s Mot. for Summ. J., Ex. I (Interim Report).) Citizens also ranked a good personality and being a "people person" as desirable characteristics in a new director of schools. (Id., Ex. I.)

On September 9, 2008, the Board elected Garrett as chairman and Robbie King vice chairman. (Id., Ex. J (Minutes of Sept. 9, 2008 Bd. Mtg.).) Battle submitted an application for the director of schools position to the TSBA. (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. K (TSBA Final Report) at 52.) Marlon King also applied for the position through the

TSBA. (Def.'s Mot. for Summ. J., Ex. 32 (Dep. of Marlon King ("M. King Dep.")) at 30-32.) King

had served as principal of two elementary schools in Fayette County, Tennessee since 2004. (Pl.'s

Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. H (Resume of Marlon D. King).)

His prior experience included a elementary school teaching position in Shelby County, Tennessee

from 2000 to 2004 and an educational assistantship at Eastside Elementary School in Haywood

County from 1996 to 2000. (Id.) He received an undergraduate degree in elementary education

from LeMoyne-Owen College in Memphis in 2000, a master's degree in educational leadership from

Trevecca Nazarene University in Nashville, Tennessee in 2003 and a doctorate in education

curriculum and instruction from the University of Mississippi in 2010. (Id.)

He acknowledged in his deposition that he had no prior experience administering a school

district; advising a board of education as to the laws, rules or regulations relating to the schools in

its district; keeping detailed and accurate account of receipts and disbursement of school funds

pursuant to state rules and regulations; general supervision of schools in a district; advising teachers

and local board of education members as to the condition of schools and the need for improvement

thereof; requiring schools to use the state course of study for all public schools in a system of

promoting pupils through the grades in accordance with state commissioner of education

regulations; recommending teacher salaries; assessing and assigning teachers and assistants to

various schools; making reports to a governing body of receipts and expenditures of school funds;

attending settlements of a county trustee; making reports to the state commissioner of education; or

preparing annual school budgets. (M. King Dep. at 26-30.) He was not chosen for the list of

candidates by the TSBA. (Id. at 33.)

Board meetings concerning the selection were heavily attended and citizens often carried

signs. (Garrett Dep. at 72-73.) Some indicated that it was time for a change, which Garrett took to refer both to the selection process in general and the selection of certain persons in particular, including Battle. (Garrett Dep. at 73-74.) When asked if the Plaintiff was mentioned by name, he recalled that "[t]here were comments made," but he could not remember what they all were and that no one specifically told the Board not to hire her. (Garrett Dep. at 74.) According to the Plaintiff, the picket signs were directed at the process itself; pointing out in her deposition that none referred to her by name. (Def.'s Mot. for Summ. J., Ex. 26 (Videotaped Dep. of Doris Battle ("Battle Dep.")) at 105.) Five hundred forty-eight citizens signed their names to an October 2008 petition supporting Battle's hiring. (Pl.'s Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. S (Pet.).)

At an October 14, 2008 Board meeting, Grissom presented the names of the four candidates chosen by the TSBA: Dr. Cedrick Gray, principal of Lester Demonstration School in Memphis; Dr. Brenda King, director of human resources of the Metropolitan Nashville Public Schools; Dr. Timothy Setterlund, principal of Collierville, Tennessee High School; and the Plaintiff. (Def.'s Mot. for Summ. J., Ex. K (Minutes of Oct. 14, 2008 Bd. Mtg.).) Currie asked Grissom why TSBA had not recommended five candidates. (Id., Ex. K.) Grissom "reminded [Currie] that the agreement was that TSBA would bring up to five candidates and that they (TSBA) were not going to present people that were not qualified just to make that number." (Id., Ex. K.) Currie, Thornton and Garrett asked to see a list of all the applicants. (Id., Ex. K.) Grissom brought the applications of the eight candidates not selected by TSBA to the meeting and left them with the Board. (Id., Ex. K; id., Ex. L (Minutes of Oct. 23, 2008 Bd. Mtg.).) Hess made a motion to accept the four candidates presented, which passed. (Id., Ex. K.) Subsequent to the October 14 meeting, Setterlund asked that his name be removed as a candidate. (Id., Ex. L.)

At a Board meeting called by Garrett on October 23, 2008, he stated that he had reviewed the unsuccessful applications and found one candidate, Marlon King, who he believed should be included in the list of finalists. (Id., Ex. L; Garrett Dep. at 107-08.) Garrett alone reviewed the rejected applications and discussed them with no one else on the Board. (Garrett Dep. at 112-14, Thornton Dep. at 18, Hess Dep. at 15-20, Def.'s Mot. for Summ. J., Ex. 35 (Dep. of Robbie Jarrett-King ("R. King Dep.")) at 58.) In reviewing the applications, he chose not to seek a vote to add another unsuccessful candidate, Tamitha Campbell, to the list even though she had qualifications that Marlon King did not. (Garrett Dep. at 97-102.) When asked for an explanation for his action during his deposition, Garrett responded, "I can't specifically say why that I decided that she shouldn't be or should be or what my feelings were about her application." (Id. at 98.) Upon a motion to add Marlon King to the list, only Hess voted "no." (Def.'s Mot. for Summ. J., Ex. L.) Hess and Robbie King, when presented with Campbell's resume in their depositions, testified that they considered her to be qualified for the director of schools position. (Hess Dep. at 19-20, R. King Dep. at 60-63.) Neither had seen Campbell's resume prior to their depositions and could not explain why they had not seen it. (Hess Dep. at 20, R. King Dep. at 60.)

A citizen in the audience at the October 23, 2008 meeting stood and stated that the public should have been permitted to speak before the motion to consider King was made. (Id., Ex. L.) Garrett "thanked him but said it was up to the Board to make the decision" and that "he knew there were strong feelings for each candidate and that the community would be allowed to participate in the Community Forum and the Board was concerned with their input." (Id., Ex. L.)

> Mr. Garrett said that by adding another candidate it would only be a loss if their mind was already made up otherwise it would be a gain to have another candidate. Mr. Garrett also said he felt it was the Board[']s obligation to consider another candidate if they were worthy.

(Id., Ex. L.)

According to Thornton, there was a "large group of people that even circled [sic] a petition in the community to try to gain support for the candidate, Mr. King." (Thornton Dep. at 11.) Several of his constituents voiced the opinion that King would be a wise choice to at least interview because he was a former local individual. (Id. at 11-12.) When asked in his deposition if he got a sense from other Board members that there was talk about Mr. King while TSBA was conducting its search, Thornton stated that

> I just know for me and the people that I came in contact with, it seems like Marlon's name was first addressed by the chairman of the board, Mr. Garrett, as being that fifth candidate that he had seen -- because he had received the resumes; we had not -- and thought that based upon his resume that he needed to be considered. And because I had heard so much, also received some kind of word about this petition that had gone around, and that he had had multiple individuals sign this petition that it was worthy of an interview.

(Id. at 12-13.) Thornton had heard negative comments about King in the community, including that he lacked upper level, that is, high school leadership abilities; his qualifications "weren't as great"; he was too young; he lacked higher level training; and concerns whether "he could handle the size of the district versus his minimal experience with the size of the district that he was currently in in Fayette County." (Id. at 27-28.) According to Thornton, there were "hundreds for and hundreds against" Mr. King. (Id. at 28.)

Community members were present during the Board interviews of each candidate and were provided forms upon which they could offer anonymous comments if they desired. (Battle Dep. at 174, Garrett Dep. at 53.) Each Board member reviewed the comment sheets. (Garrett Dep. at 53.) For his part, Garrett recalled that he "gave [them] very little weight," adding, "What it did for me, it just reinforced the decision that I had come to -- the conclusion that I had come to where I was in

12

this process that Mr. King was the candidate.  He was the best one."  (Id. at 52.)  The comment sheets revealed that some citizens had previous negative attitudes toward the Plaintiff.  (Def.'s Mot. for Summ. J., Ex. M.)  It was noted by community members that she had split the district into "high profile" and "low profile"; led by intimidation rather than example, leading to low teacher morale; ignored school safety issues; was not active in community organizations; did not respect and support the teachers; lacked integrity, energy, enthusiasm, compassion, the ability to inspire stakeholders and, at times, professionalism; was out of touch with some parts of the community, i.e., the county's poor residents; was unfair, inconsistent, harsh, unfriendly, abrasive, arrogant, boastful and too old; did not listen to or respect parents; was unable to make decisions; was not technologically savvy; made offputting negative and belittling remarks about other candidates in the interview process; lacked vision for the school system and a plan for moving forward; was not a people person; and did not have a good disposition and rapport with others.  (Id., Ex. M.)

Gray and King also evoked negative comments.  With respect to the former, some citizens had concerns that he would treat their small hometown schools like an urban system, had too little experience at the administrative level, was too young, would use the position as a stepping stone and therefore not stay to finish what he started, might lack commitment to long range plans, failed to answer questions directly, and might not be qualified or prepared for the challenges present in the school system.  (Id., Ex. N.)  As for the latter, some believed King lacked experience; would be unable to deliver on his promises; appeared nervousness and anxious during the interview; would use the position to gain another elsewhere; as a local, there was a possibility of influence from friends and family; and was too young and unprepared for the job.  (Id., Ex. O.)  Based on the evidence before the Court, however, the majority of the negative commentary was directed toward

Battle.  (*See generally* <u>id.</u>, Exs. M-O.)

At the November 3, 2008 Board meeting, Garrett explained that each member was to list the names of their top two choices for director of schools, not necessarily ranked in order of preference. (<u>Id.</u>, Ex. P (Minutes of Nov. 3, 2008 Bd. Mtg.).)  In the event of tie, the Board was to vote again. (<u>Id.</u>, Ex. P.)  The Board would then focus on the candidate receiving the largest number of votes. (<u>Id.</u>, Ex. P.)  Robbie King, Currie and Thornton voted for Gray and Mr. King, Hess voted for Battle and Gray, and Garrett cast his votes for Battle and Mr. King.  (<u>Id.</u>, Ex. P.)  Thus, Gray and Mr. King tied with four votes each, while Battle received only two votes.  (<u>Id.</u>, Ex. P.)  A second vote was taken and, after some discussion, Robbie King, Currie, Thornton and Garrett voted for Marlon King, with Hess voting for Battle.  (<u>Id.</u>, Ex. P.)  Currie made a motion to permit Garrett to enter into contract negotiations with Mr. King for the director of schools position, which carried.  (<u>Id.</u>, Ex. P.)  Garrett announced at the November 11, 2008 Board meeting that an agreement had been reached with Mr. King and obtained approval of his employment contract beginning January 1, 2009.  (<u>Id.</u>, Ex. Q (Minutes of Nov. 11, 2008 Bd. Mtg.).)

Attached as an exhibit to the contract was the following job description for the director of schools position:

The Director of Schools will:

1.    Act for the Board in seeing that the laws relating to the schools, and rules of the state and the local Board of Education are faithfully executed;

2.    Attend all meetings of the Board of Education and to serve as a member of the executive committee of the Board, with[]out additional compensation, except as Board Secretary;

3.    Keep in a well bound book, furnished by the Board, a complete and accurate record of the proceedings of all meetings of the Board and of the Director of Schools' official acts;

4. Keep in well bound books, furnished by the Board and arranged according to the regulations prescribed by the Commissioner of Education, a detailed and accurate account of all receipts and disbursement of public school funds;

5. Issue, within ten (10) days, all warrants authorized by the Board of Education for expenditures for public school funds;

6. Make such recommendations to the Board of Education as the Director of Schools deems for the best interest of the public schools, but in no case shall the Director have a vote on any question coming before the Board.

7. Have general supervision of all schools, and to visit the schools from time to time, and advise with the teachers and members of the Board of Education as to their condition and environment.

8. Require the use of the state course of study for all the public schools and the system of promoting pupils through the several grades thereof in accordance with regulations of the Commissioner of Education, as approved by the State Board;

9. Sign all certificates and diplomas of pupils who complete the courses of study prescribed for the elementary and high schools;

10. Recommend to the Board of Education teachers who are eligible for tenure.

11. Recommend to the Board salaries for teachers in accordance with the salary schedule and the salaries and wages of all other employees nominated by him;

12. Assign teachers and educational assistants to the several schools;

13. Require all teachers to submit to the Director of Schools for record their licenses, or authority to teach, given by the State Board of Education, and to keep a complete record of same;

14. File all contracts entered into with teachers and employees of the Board of Education, before they begin their services in the public schools;

15. Furnish to teachers of [sic] principals the names of pupils belonging to their respective schools, the list to be taken from the census enumeration or other reliable records on file in his office;

16. Issue certificates relative to the employment of minors who are enrolled as students in his district;

17. Prepare reports of attendance to be assembled by the Director of Schools; provided, that the Director of Schools shall report to the Commissioner of Education any failure on the part of any principal or director of any school system within the county to make such reports;

18. Report to the County Trustee and the Commissioner of Education, on or before July 1 of each year, the attendance;

19. Make a written report, quarterly, to the appropriate local legislative body, for the Board of Education, of all receipts and expenditures of the public school funds, which accounts shall contain full information concerning the conditions, progress, and needs of the schools of the school system and which shall be audited by the appropriate fiscal officer and local legislative body;

20. Be present at all quarterly and annual settlements of the county trustee with the county executive covering all school funds arising from state apportionments, county levies and all other sources, and report the Director of Schools' acts to the Director of Schools' Board of Education;

21. Report to the local legislative body and the Commissioner of Education, whenever it appears to the Director of Schools that any portion of the school fund has been, or is in danger of being, misappropriated or in any way illegally disposed of or not collected;

22. Make reports to the Commissioner of Education when requested by the Director of Schools;

23. Prepare, annually, a budget for the schools in the Director of Schools' system, to submit the same to the Board of Education for its approval and to present it to the county or other appropriate local legislative body for adoption as provided for by charter or private legislative act.

   A. Such budget shall set forth in itemized form the amount necessary to operate the schools for the scholastic year beginning on July 1, following, or on such date as provided for by charter or private legislative act.

   B. Any change in the expenditure of money as provided for by the budget shall first be ratified by the local Board of Education and the appropriate local legislative body;

24. Give the Director of Schools' full time and attention to the duties of the Director's position;

25.  Deliver to the Director's successor all records and official papers belonging to the position.  It is a Class C misdemeanor to refuse to deliver such records and files on demand of the Director's successor.  It is a separate offense for each month during which the Director persists in withholding the same;

26.  File with the Commissioner of Education a copy of the budget adopted by the county or other appropriate local legislative body within ten (10) days after it['s] adoption;

27.  Furnish the Commissioner of Education a list of the Teachers elected by the Board of Education and their respective salaries, on forms furnished by the Commissioner;

28.[1]  Grant any licensed employee, or any other person considered as a professional employee, access at any reasonable time to the employee's personnel file or files, whether maintained by the employee's principal, supervisor, Director, Board of Education or any other official of the school system;

30.  Give any licensed and/or professional employee, on request and on payment of reasonable compensation, a copy of specified documents in such employee's personnel file;

31.  Establish a procedure whereby an updated copy of the rules, regulations, and minimum standards of the State Board of Education shall be kept on file in an easily accessible place in each school library during normal school hours;

32.  Employ, transfer, suspend, non-renew and dismiss all personnel within the approved budget, except as provided in 49-2-203(a)(1) and in chapter 5, part 5 of this title;

33.  All persons who are employed in a position for which no teaching license is required shall be hired on a year-to-year contract.  The Director shall provide a person who is employed in such a position fifteen (15) days' notice of nonrenewal of the contract before the end of the contract period;

34.  The Director may dismiss any employee under the Director's jurisdiction for incompetence, inefficiency, insubordination, improper conduct or neglect of duty; provided, that no one shall be dismissed without first having been given in writing, due notice of the charge or charges and an opportunity for defense;

---

[1]In the exhibit, this paragraph was designated as 28 and 29.

35. All actions of the Director or their designees shall be consistent with the existing Board policies, rules, contracts and regulations; and

36. Perform such other official duties as may be prescribed by law.

(Pl.'s Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. C (Contract of Employment), Ex. A (Job Description).)

The Plaintiff complained to Board members, including Garrett, that Mr. King began immediately after the vote issuing directives, making purchases, and conducting business as if he were acting superintendent without consulting her, even though he was not technically authorized to do so until January 2009. (Battle Dep. at 153-59.) In a tape recording of a telephone conversation between Battle and Garrett, the Board chairman appeared sympathetic to her position, noting that director of schools business should flow through her office and that King should confer with her concerning the transition. (Id.) The Plaintiff was unsatisfied, stating in her deposition that "I wanted Mr. Garrett to assure me that he would make sure that the candidate they had appointed was going to follow the proper procedures. And I'm not saying that I agree that that -- that I got that feeling from that." (Id. at 158.) In a letter dated November 25, 2008, Garrett advised Battle of her reassignment to the position of assistant director of schools effective January 1, 2009. (Def.'s Mot. for Summ. J., Ex. R (Letter to Battle dated Nov. 25, 2008).) King proposed a new organizational chart for the school district which, in part, created a new position, the Community Relations and School Improvement Ambassador, that was higher than the assistant director of schools position. (Pl.'s Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. J.)

The Plaintiff surreptitiously tape recorded conversations she had with Thornton and Mr. King. (Battle Dep. at 156.) In one such conversation with King, Battle accused him of being the catalyst for a "movement to destroy [her] career and to defame [her] character." (Def.'s Mot. for

Summ. J., Ex. V at 26.)  In a taped exchange with Thornton, the Plaintiff stated that

> I think that that's what I feel I feel that's what our Board made their decision on, rumors and personal issues that they had with me that had nothing to do with the other Director of schools.  That -- I mean, that's just how I feel.  I mean, so, you know, all across the Board, I think there were those who had personal issues with me, and they took this as a [] time to make sure that they got revenge through making sure they took me out of my position . . .

> *          *          *

> There's a way to tell people, I don't want you to be the Director, even if you hate their guts.

(Id., Ex. T at 20-21, 25.)  There is no evidence whatever in the transcripts provided to the Court of any conversations concerning Battle's gender.

In a letter to the Board dated December 19, 2008, the Plaintiff resigned from her position with the school system effective December 31, 2008.  (Id., Ex. W (Letter to Haywood Bd. of Educ.).)  In January 2009, Battle filed a charge with the Equal Employment Opportunity Commission (EEOC) claiming retaliation and discrimination on the basis of sex and age.[2]  (Id., Ex. X (Discrimination Charge).)

It was Gruenewald's opinion that Battle was qualified to serve as director of schools based upon the job she did as an assistant.  (Gruenewald Dep. at 24-25, 29; *see also* Pl.'s Third Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. B (Mar. 7, 2007 Ltr. of Gruenewald recommending Pl. for Prospective Superintendent's Academy)).  Specifically, she was impressed with the programs instituted by the Plaintiff as well as her high standards of excellence. (Gruenewald Dep. at 24-25.)

---

[2]In this action, the Plaintiff is not pursuing a claim of age discrimination.  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 66.)

Chapman also considered Battle qualified for the position. (Pl.'s Second Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. 1 (Dep. of George Chapman) at 27, 29.) He knew Mr. King, and stated in his deposition that he would not have chosen him over Battle. (Id. at 28-29.) Upon review of King's resume during the deposition, Chapman stated that he would not have selected him because King appeared to "be lacking in the qualities I'd be looking for," particularly with respect to central office experience. (Id. at 40-41.) He also submitted a recommendation letter on Battle's behalf to the Board with respect to the director of schools position. (Pl.'s Third Notice of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. C (Chapman Recommendation Ltr.).) Therein, the former director of schools gave "the strongest recommendation possible" to the Plaintiff and stated in part as follows:

> During the last eight years Ms. Battle has served Haywood County Schools in an exemplary manner as Assistant Director of Schools. During that time she has been extensively involved in practically every aspect of the management of our schools. Some of her major areas of involvement are as follows:
>
> - Personnel - including recruiting, interviewing, hiring, and placement as well as assisting teachers with licensing issues
> - Public Relations - including billboards, the Notebook, family friendly initiatives at individual schools, and radio public announcements
> - State Reports - including preliminary reports for each school, civil rights reports, summer school reports and our ongoing Tennessee Comprehensive Systemwide Planning Process (TCSPP) initiative
> - Dealing with parental complaints
> - Negotiating with the Haywood County Education Association as a preliminary activity to developing the school system budget.

(Id.) Chapman further highlighted Battle's attendance at a year-long professional development activity for prospective directors of schools sponsored by the TSBA and Tennessee Organization of School Superintendents, for which she received very high marks. (Id.)

Currie believed Battle was qualified to be director of schools (Currie Dep. at 12), as did

Thornton (Thornton Dep. at 54). When asked in her deposition whether she thought Mr. King, whom she knew, was qualified for the job, Hess responded, "I didn't feel that he had had any experience in a position like that. The only thing I knew he had done, he was a principal of a small school in Fayette County, a middle school, and he had not been working that long. I just felt he didn't have the experience. I'll put it like that." (Hess Dep. at 16-17.) Robbie King also stated in her deposition that Battle was more qualified than Mr. King. ®. King Dep. at 86.) She was unaware that King had been rejected as a candidate by the TSBA. (Id. at 97-102.)

On the other hand, Garrett related in his deposition that he found the Plaintiff suffered a lack of preparedness, vision and initiative. (Garrett Dep. at 110.) Garrett recalled that Mr. King expressed his vision for the school district through a written 100-day plan and that he had an impressive record of leadership as a principal in Fayette County. (Id. at 29-31.) He stated that

> [King] had taken schools that were in pretty bad condition academically. In one
> school he had brought to blue ribbon status [sic]. The second school was another
> low-performing school that he had been placed in, and it was also making great
> advances. He was, you know, recognized by the State Department of Education for
> being one of the best principals in the state of Tennessee. He had been selected to
> speak to a large audience, I think 6,000 people . . . [o]n how he had managed to
> bring, you know, these schools up, and he had such a passion and such a vision, and
> it was very impressive.

> \*      \*      \*

> [W]hile he was a candidate, I went to his school and observed him in -- and he was
> having a morning meeting, as a matter of fact, and the manner in which his staff
> responded to him, supported him, the manner in which the children responded to him
> and wanted to please him during that assembly -- little children, especially in this
> low poverty area school, who were so advanced in their answering and in their
> demeanor, in their conduct toward him, was astounding.

(Id. at 30-31, 43.) Gossett spoke to one of Mr. King's references, Miles Wilson, director of the Fayette County schools, who advised him that "on a scale from one to a hundred, [King's] 350" and

that "I'd hate to lose this young man, but I don't want to hold him back."  (Id. at 43-44.)  Finally,

Gossett revealed that

> Marlon King was so well respected by the State Department of Education that when
> I called Mr. Jim Herman at the State Department of Education, who was also listed
> as one of Mr. King's references, to see what he had to say, he said, "He is the best
> principal in the state of Tennessee.  He's the top principal in the state of Tennessee."
> He says, "I use him all the time for briefings and conferences, and I send people to
> him all the time."

(Id. at 44-45.)  Thornton was impressed with his youth and vigor, as well as the fact that he had been

recognized to speak with former First Lady Laura Bush on reading excellence.  (Thornton Dep. at

28-29.)

## CONTENTS OF THE PARTIES AND ANALYSIS

### Claims of Common Law Retaliation and Violation of §§ 1981 and 1983.

In her response to the instant motion, the Plaintiff concedes the Board has no liability with

respect to her claims of common law retaliation and for violation of §§ 1981 and 1983.  These

claims are, therefore, DISMISSED.

### Discrimination on the Basis of Sex in Violation of Title VII and the THRA.

*Plaintiff's Status as an Employee for Purposes of Title VII.*

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to

hire . . . or otherwise to discriminate against any individual with respect to [her] compensation,

terms, conditions, or privileges of employment, because of such individual's . . . sex . . ."  42 U.S.C.

§ 2000e-2(a)(1).  The term "employee" is defined under the statute as

> an individual employed by an employer, except that the term "employee" shall not
> include any person elected to public office in any State or political subdivision of any
> State by the qualified voters thereof, or any person chosen by such officer to be on
> such officer's personal staff, or an appointee on the policy making level or an
> immediate adviser with respect to the exercise of the constitutional or legal powers

of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.[3] With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

42 U.S.C. § 2000e(f). In enacting the exemptions to the definition of an "employee," it was the conference committee's intention to "exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors *or* to policymaking positions at the *highest levels* of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level." Gregory v. Ashcroft, 501 U.S. 452, 484-85, 111 S. Ct. 2395, 2413-14, 115 L. Ed. 2d 410 (1991) (quoting H.R. Conf. Rep. No. 92-899, pp. 15-16 (1972)). It is the position of the Defendant that Battle is not an employee for purposes of Title VII and, therefore, cannot sue under the statute, as she falls under the "personal staff," "appointee on the policy making level," and "immediate adviser" exceptions.

Personal Staff Exemption

"A state government employee, not subject to the civil service laws, is not an 'employee' for Title VII purposes if she works on an elected official's 'personal staff.'" Birch v. Cuyahoga Cnty. Probate Ct., 392 F.3d 151, 158 (6th Cir. 2004) (citing 42 U.S.C. § 2000e(f)). Relevant to a court's determination is the following nonexhaustive list of factors:

(1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

---

[3]There is no indication from the evidence presented whether Battle is subject to the civil service laws.

Id. The exemption is to be "construed narrowly and involves a highly factual inquiry[.]" Id.

> Furthermore, Senator Ervin, the sponsor of the original Senate amendment, agreed that the purpose of the exception was to 'exempt from coverage those who are chosen by the elected official, and who are in a close personal relationship and an immediate relationship with him. Those who are his first line advisers.'

Gunaca v. State of Tex., 65 F.3d 467, 471 n.4 (5th Cir. 1995) (quoting Teneyuca v. Bexar Cnty., 767 F.2d 148, 152 (5th Cir. 1985)). "Congress intended for the personal staff exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official." Id.; *see also* Kelley v. City of Albuquerque, 542 F.3d 802, 820 (10th Cir. 2008) (same). The initial burden of establishing application of the exemption lies with the defendant. Oden v. Oktibbeha Cnty., Miss., 246 F.3d 458, 467 (5th Cir.), *cert. denied*, 534 U.S. 948, 122 S. Ct. 341, 151 L. Ed. 2d 258 (2001) & *cert. denied sub nom.* Bryan v. Oden, 534 U.S. 949, 122 S. Ct. 342, 151 L. Ed. 2d 258 (2001).

In this case, the "elected official" for purposes of the personal staff analysis is the Board. Battle takes issue with the application of the exception to a governing body, rather than an individual public official. Neither party has cited to caselaw on this particular question, but two cases -- Horne v. Russell County Commission, 379 F. Supp. 2d 1305 (M.D. Ala. 2005), *aff'd* 180 F. App'x 903 (11th Cir. 2006) and Gomez v. City of Eagle Pass, 91 F. Supp. 2d 1000 (W.D. Tex. 2000) -- are instructive.

Gomez sued the City of Eagle Pass, Texas alleging that she was illegally dismissed by the city council from her position as city manager because of her political affiliation and gender. Gomez, 91 F. Supp. 2d at 1001-02. The city moved for judgment as a matter of law, contending she had no remedy under Title VII pursuant to the personal staff exemption. Id. at 1002. The court declined to extend the exception beyond its unambiguous language to include the actions of

collective decisionmaking bodies, explaining that

> [t]he personal staff exception is grounded on Congress' perception that elected officials need complete loyalty from their closest staff members, untainted by the threat of litigation. It must be remembered that the exception was meant to target those close, "personal" relationships, and not merely all relationships between elected officials and their employees. . . .
>
> Such close, intense, and demanding relationships built on loyalty between superior and inferior seem, intuitively, less likely to be found in a situation where a group of persons collectively exert control over a single person. In such circumstances, it is improbable that the personal intimacy and the immediacy of the relationship between the individual and the group, or even between the individual and certain members of the group, will be of the same intensity as the intimacy and immediacy between two single persons. At the very least, it must be conceded that the two kinds of relationships are qualitatively different in some, if not many, respects. It can not, therefore, be assumed that Congress meant to preserve a set of relationships that it did not specifically mention, which fall outside the plain text of the exclusion, and which are necessarily different from the relationships targeted. Finally, regardless of the weight to be afforded the empirical observations here made, to strain the simple text of the exception where both legislative history and legal precedent clearly require a narrow reading would be specious and unwarranted.

Id. at 1006.

In Horne, the plaintiff was employed as the county administrator for Russell County, Alabama. Horne, 379 F. Supp. 2d at 1313-14. She brought a Title VII claim against the county commission, on which the defendant sought summary judgment on grounds that she was a member of its personal staff. Id. at 1316. The district court denied summary judgment, articulating that

> [t]his court concludes that the better-reasoned view is that the statutory exception to the definition of employee does not apply in this case. The plain language of the statute does not encompass persons who serve at the direction of a board or body of public officials. This court agrees that limiting the exception to persons who serve at the direction of a single public official comports with the plain meaning of the language of the exception, is most consistent with the purpose of the exception, and is most consistent with applying a narrow construction of the exception.

Id. at 1318. Upon review, the Court agrees with the cited cases, which it considers to be well-reasoned, and finds, therefore, that the plain language of the personal staff exception fails to support

its application to a decisionmaking body such as the Defendant in this case.

Policymaking Exception

Like the personal staff exemption, the policymaking exception is to be construed narrowly. Butler v. New York State Dep't of Law, 211 F.3d 739, 747 (2d Cir. 2000). Although Title VII does not define "appointee on the policy making level," the legislative history reflects that the exception was intended to exempt "persons appointed by . . . elected officials . . . to policymaking positions at the highest levels of the departments or agencies." Id.

In invoking the policymaking exemption, the Board cites to Dyer v. Radcliffe, 169 F. Supp. 2d 770 (S.D. Ohio 2001), in which the plaintiff, an employee of the Ohio Common Pleas Court, sued his employers for discrimination. Dyer, 169 F. Supp. 2d at 772-73. The employer moved for dismissal, arguing Dyer was not an "employee" under Title VII because he was a policymaking appointee. Id. at 774. The court concluded that

> [u]nder Ohio law, "the juvenile judge may appoint . . . referees. . . ." O.R.C.§ 2151.16. The Sixth Circuit has determined that the referee effectively makes policy for, or suggests policy to the court on each occasion that he resolves a dispute in the court's name or recommends a disposition to the judge. In addition, Dyer's referee position, which can be described as one "directly responsible to [an] elected county official[ ] . . . and holding a fiduciary or administrative relationship to such elected county official [] . . . .[,]" is also exempt from the civil service laws. O.R.C. § 124. (A)(9). Because Dyer's position was an appointee on the policy making level, and he is exempt from the civil service laws of Ohio, he is not an employee under Title VII.

Id. at 774-75 (alterations in original) (citations & some internal quotation marks omitted).

The Dyer court relied in part on a previous decision from the Sixth Circuit involving the definition of a policymaker in the context of a suit under 42 U.S.C. § 1983 alleging termination based on political affiliation. Id. at 774 (citing Mumford v. Basinski, 105 F.3d 264 (6th Cir.), cert. denied, 522 U.S. 914, 118 S. Ct. 298, 139 L. Ed. 2d 229 (1997)); see Mumford, 105 F.3d at 272.

In Mumford, the plaintiff served as a referee for the administrative judge of the Lorain County, Ohio Common Pleas Court Domestic Relations Division. Mumford, 105 F.3d at 266. The court found that

> [u]nquestionably, the inherent duties of an Ohio domestic relations court referee entail a relationship of confidence between the referee and the judge(s) which he serves. The referee is privy to confidential litigation materials and internal court communications in the discharge of his duties, and further maintains a personal confidential relationship with the judge(s) which he serves. Moreover, the referee effectively makes policy for, or suggests policy to, the court on each occasion that he resolves a dispute in the court's name or recommends a disposition to a judge. Consequently, his supervising judge must be convinced that the judgment capabilities of the referee, and the confidential relationships that arise as a result of the intimate judicial and quasi-judicial discussions, are unquestionable. The referee's political ideology, associations, and activities may rationally influence a judge's assessment of an individual's suitability for a position as his referee.

Id. at 272 (internal citations omitted). In 2004, the Sixth Circuit held in Birch, in which the question before the court was whether the plaintiff, a probate court magistrate, was an "appointee on the policy making level" for purposes of Title VII, that "[s]ince the inherent duties of a probate magistrate are delineated by the same Ohio Rules of Civil Procedure that govern a domestic relations magistrate, Mumford compels us to conclude that Birch effectively makes policy for the Probate Court by resolving disputes and recommending dispositions to Judge Donnelly." Birch, 392 F.3d at 155, 158, 160 (internal footnote omitted). Here, while the director of schools makes recommendations to the Board on certain matters, there is no evidence of the type of confidential, intimate relationship between the appointee and a public official present in the cited cases.

Some courts have identified various factors relevant to the determination of whether an employee falls into the policymaking exemption, including (1) whether the appointee serves at the pleasure of the appointing authority, (2) whether she has discretionary rather than administrative powers and (3) whether she formulates policy. Watts v. Bibb Cnty., Ga., No. 5:08-CV-413 (CAR),

2010 WL 3937397, at *9 (M.D. Ga. Sept. 30, 2010) (quoting Stillians v. Iowa, 843 F.2d 276 (8th Cir. 1988), *abrogated on other grounds by* Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 111 S. Ct. 2166, 115 L. Ed. 2d 96 (1991)), *mot. to certify app. granted by* 2010 WL 5015414 (M.D. Ga. Dec. 3, 2010); Gomez-Mesquita v. City of Detroit, No. 06-12844, 2007 WL 2225859, at *3 (E.D. Mich. Aug. 2, 2007); Gomez, 91 F. Supp. 2d at 1004 (same, citing Stillians). Again, Gomez offers guidance. Therein, the court found that the plaintiff was "responsible for the ministerial execution of the laws and the administration of the government of the city." Gomez, 91 F. Supp. 2d at 1004. That is, Gomez was charged with implementing the policies developed by the city council. Id. at 1004-05. Even though Gomez had the power to appoint, suspend and remove city employees, such decisions were "so tightly circumscribed by local custom, city ordinances, state statutes, and the Eagle Pass City Charter, that they [were] properly characterized as administrative decisions made in furtherance of the city manager's duty to supervise the administration of city government[.]" Id. at 1005.

It is the position of the Defendant in this case that Battle fell under the policymaking exception because she solved disputes on behalf of the Board and made recommendations thereto on issues such as dismissal of tenured teachers and student expulsions. The Defendant also points to the fact that she served as secretary to the Board and made decisions as to the day-to-day disbursement of funds throughout the school system. Like Gomez, the evidence presented reflects that the director of schools in Haywood County was charged with implementing the rules promulgated by the Board and the State of Tennessee. The director of schools was to "[a]ct for the Board in seeing that the laws relating to the schools, and rules of the state and the local Board of Education are faithfully executed[.]" (Pl.'s Notice of Filing of Exs. in Opp'n of Def.'s Mot. for

Summ. J., Ex. C (Contract of Employment).)  Actions performed by the director of schools were to be "consistent with the existing Board policies, rules, contracts and regulations[.]"  Id.  It was expressly within the province of the Board to "authorize all expenditures, employ and dismiss all tenured teachers, approve the annual budget, and determine policy.  The decisions of the Board concerning these matters will guide the actions of the director of schools and his/her staff."  (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., Ex. C.)

Taking the factors enumerated above into account, this Court does not find as a matter of law that the policymaking exemption applies to the Plaintiff.  Clearly, the director of schools served at the pleasure of the Board.  Furthermore, there is at least a question of fact as to whether the holder of the position held plenary powers or formulated policy.


## Immediate Adviser Exception

This exemption bears several similarities to the personal staff exception.[4]  Kelley, 542 F.3d at 808 n.7.  In Kelley, upon which the Defendant relies, the court identified a nonexhaustive list of factors relevant to the exception, including "(1) whether the elected official is charged with appointing or terminating individuals in the position; (2) whether the position reports to an intermediary appointee rather than directly to the elected official; and (3) whether the elected official exercises control over the independent judgment of one holding the position."  Id. at 809-10.

The Defendant submits, and Battle does not appear to dispute, that it is charged with appointing and terminating the director of schools, who reports directly to the Board.  The parties do differ, however, on the third factor.  The Defendant insists that it exercises final decisional

---

[4]That said, the Court will assume for purposes of discussion that this exemption encompasses appointments by decision-making bodies.

authority on issues within the school system and, thus, Battle is an "immediate adviser" to the Board, while the Plaintiff counters that it exerts no real control over the director's independent judgment in fulfilling the duties listed on the position's job description. The Court need not resolve that dispute, however, based on the statutory language itself. Section 2000e(f) does not exclude from the definition of "employee" an "immediate adviser" for any and all purposes but only those "*with respect to the exercise of the constitutional or legal powers of the office.*" 42 U.S.C. § 2000e(f) (emphasis added). According to the job description for the director of schools, the holder of that position is to advise the Board concerning teacher eligibility and salaries, as well as what he or she deems to be in the best interests of the Haywood County schools. The Defendant has offered no evidence from which the Court could determine as a matter of law that the director of schools is an immediate adviser with respect to the exercise of the constitutional or legal powers of the Board. *See* Kelley, 542 F.3d at 812 (city failed to identify evidence that would tend to show that representation of mayor when sued in his individual capacity required assistant city attorneys to advise the mayor *concerning the constitutional and legal powers of his office*, and court was unwilling to assume such was the case).[5]

Based on its finding that the Defendant has failed to make a persuasive argument that Battle is not as a matter of law a covered employee for purposes of Title VII, the Court will continue its analysis of her claims under that statute.[6]

---

[5]The Court notes that the plaintiff in Kelley served as an assistant city attorney. Kelley, 542 F.3d at 804.

[6]For this reason, the Court need not address the Defendant's assertions with respect to the Government Employee Rights Act of 1991 (GERA), 42 U.S.C. § 2000e-16a, *et seq,* which "extends workplace discrimination rights to certain governmental employees exempted by Title VII." *See* Marion Cnty. Coroner's Office v. E.E.O.C, 612 F.3d 924, 928 n.4 (7th Cir. 2010).

*Merits of Discrimination Claims.*

The Plaintiff has alleged discrimination on the basis of gender under both Title VII and the THRA. In enacting the latter, the Tennessee legislature "intended to further the policies" of Title VII and, therefore, courts interpreting the THRA "may appropriately look to decisions of federal courts construing Title VII when analyzing claims under" the state statute. Payne v. Goodman Mfg. Co., L.P., 726 F. Supp. 2d 891, 903 (E.D. Tenn. 2010).

As is the case here, "[i]n the absence of direct evidence of discrimination, Title VII claims are subject to the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as subsequently modified in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Risch v. Royal Oak Police Dep't, 581 F.3d 383, 390 (6th Cir. 2009), *reh'g & reh'g en banc denied* (Nov. 25, 2009). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry." Blair v. Henry Filters, Inc., 505 F.3d 517, 524 (6th Cir. 2007), *reh'g & reh'g en banc denied* (Feb. 7, 2008) (overruled on other grounds). Under this paradigm, a plaintiff must first "submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination." Risch, 581 F.3d at 391. If she succeeds, "the defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action." Id. At that point, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." Id. "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id.

In order to demonstrate a prima facie case of gender discrimination, a plaintiff must show that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." Grace v. USCAR, 521 F.3d 655, 677 (6th Cir. 2008), *reh'g & reh'g en banc denied* (July 2, 2008). "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." Id. (quoting Wexler v. White's Fine Furniture, 317 F.3d 564, 574 (6th Cir. 2003)). It is the third element of the prima facie case with which the Board takes issue.

"To establish that she is qualified for the position, a Title VII plaintiff need only show that she satisfied an employer's 'objective' qualifications." Upshaw v. Ford Motor Co., 576 F.3d 576, 585 (6th Cir. 2009), *reh'g & reh'g en banc denied* (Nov. 25, 2009). As the Sixth Circuit explained in Wexler,

> [a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

Wexler, 317 F.3d at 575-76 (internal citations omitted).

Specifically, Defendant points to survey results from the community indicating that being a "people person" was important in a director of schools. Since it was the opinion of several that she lacked good interpersonal skills, Battle was not, the Board insists, qualified for the position. The Defendant also points to Garrett's assessment that she was graced neither with preparedness nor

vision nor initiative. However, even if the Court were to find that a prima facie case has been established by the Plaintiff, the Defendant has brought forth legitimate nondiscriminatory reasons for its actions, which the Court finds were not based on pretext. The Board's proffered reasons for hiring Mr. King over the Plaintiff were, as alluded to above, that Battle was viewed as having difficulty working with others in a positive way and that the majority of Board members perceived Mr. King as energetic, innovative and a candidate favored by the community.

A plaintiff may show pretext by "showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." Sybrandt v. Home Depot, U.S.A., Inc., 560 F.3d 553, 558 (6th Cir. 2009) (citation & internal quotation marks omitted). "A plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Id. (quoting White v. Baxter Healthcare Corp., 533 F.3d 381, 393 (6th Cir. 2008)) (internal quotation marks omitted).

Battle identifies the following actions of the Defendant as evidence of pretext: (1) the Board's deviation from its practice of immediately moving the assistant director of schools into the interim director position; (2) Garrett's recommendation that Mr. King be considered as a candidate for the director of schools position even though he was rejected by TSBA; and (3) Garrett's decision not to petition the other Board members to accept Campbell, who was arguably more qualified than King, as a candidate. The first is of little benefit to the Plaintiff. Although she charges that Garrett conducted his own independent search for an interim director "wherein he only contacted males to determine if they would agree to serve" in the position prior to the establishment of the search

committee on June 2, 2008, Agnotti testified in his deposition that Garrett told him he had several people in mind for the job, including Dr. Scott, a female. (Agnotti Dep. at 11.) Moreover, Garrett ultimately recommended Battle to fill the post. It is worth noting that, at the time the decision was made to search for an interim director, Patricia Gruenewald was chairman of the Board, not Garrett. It was she, according to Garrett, who recommended to the Board that it conduct a search for an interim director. Plaintiff has offered no evidence to the contrary.

Battle's remaining assertions of pretext fail as well. It is undisputed that the Board was not obligated to consider only those candidates recommended by TSBA, notwithstanding the fact that local boards generally did so. The slate of recommended candidates was comprised of two women and two men, one of whom later removed his name from consideration. Garrett requested and reviewed the applications rejected by the Association, including those of King and Campbell. Garrett moved to add King, but not Campbell, to the list of candidates, which resulted again in a slate of two females and two males. Battle posits that the "cat's paw" doctrine applies to Garrett's conduct. "In the employment discrimination context, what is known as the 'cat's paw' theory refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse hiring decision, thereby hiding the subordinate's discriminatory intent." Cobbins v. Tennessee Dep't of Transp., 566 F.3d 582, 586 n.5 (6th Cir. 2009). Even if Garrett could be characterized as a biased subordinate, Battle has pointed to no evidence that he influenced the other Board members to choose any particular candidate.

Battle argues further that Garrett's failure to seek a Board vote to also include Campbell, a female, as a potential candidate evidences discriminatory motive. However, in asserting that Mr. King's consideration by Garrett was improperly motivated, the Plaintiff has relied upon his rejection

as a viable candidate by TSBA. If King was not a worthy candidate based on the Association's determination, then neither was Campbell.

The Plaintiff has also maintained generally in response to the instant motion that Mr. King's lack of qualifications compared to hers was an indicator of discriminatory animus. Qualifications evidence at the pretext stage was discussed at some length by the Sixth Circuit in Bender v. Hecht's Department Stores, 455 F.3d 612 (6th Cir. 2006), *cert. denied*, 550 U.S. 904, 127 S. Ct. 2100, 167 L. Ed. 2d 814 (2007). The court explained that

> [w]hether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

Bender, 455 F.3d at 626-27 (internal citations omitted). "[W]hen qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." Id. at 627.

A reasonable decisionmaker could certainly make a plausible case for choosing Battle over Mr. King. The Plaintiff had similar educational credentials. (Chapman Dep., Ex. 2.) She had worked as a teacher and as an adult education instructor for eight years and had been employed as a principal and/or assistant principal for a total of five years. (Id.) Battle served as assistant director of schools in Haywood County from 1997 to 2008, when she became interim director. (Id.) In

addition, she received numerous awards and presentations, performed extensive community service, authored published articles, and participated in leadership development programs and professional activities. (Id.) Clearly, the Plaintiff was qualified for the position she sought based on her work experience and education and, indeed, the Defendant has not suggested otherwise.

An equally reasonable decisionmaker could make the case that Mr. King was a better candidate, even though he lacked Battle's long years of experience. On his resume was a quote from Herman, Reading First State Director for Tennessee, stating, "Marlon, the support, energy, and positive leadership you have exemplified since the inception of Reading First is to be applauded. Your ability to motivate teachers and students is something school districts hope to find in all administrators. I commend and appreciate your outstanding contribution to Reading First in Tennessee." (Pl.'s Not. of Filing of Exs. in Opp'n to Def.'s Mot. for Summ. J., Ex. H (Resume of Marlon D. King).) Mr. King met the minimum qualifications for a director of schools in Haywood County with respect to education, experience and licensing. Further, he was involved in the International Reading Association, the Association for Supervision and Curriculum Development and the American Association of School Administrators. (Id.) King also had something even Battle admits she lacked -- wide, albeit not unanimous, community support and the perception of being better able to get along with others. It is undisputed that the latter quality had been identified by the community as a very important one to be considered in selecting a new director of schools. As the court pointed out in Bender, "[i]f two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the other's." Bender, 455 F.3d at 628. Thus, Battle's qualifications cannot on their own result in a finding in her favor on summary

judgment.[7]

Finally, Battle suggests that Haywood County's failure to hire a female director of schools proves gender bias. According to her deposition, Gruenewald, who had been on the Board for thirty-three years and served as chairman for twenty, could recall only one other woman, Dr. Betty Cooper, who ever applied for an available director of schools position. (Gruenewald Dep. at 7, 12.) She thought there might have been one other female applicant but could not recall her name. (Id. at 12.) This scant evidence is meaningless to the issue at hand, as the Court has no way of knowing the qualifications of Cooper or the other female, if there was one, compared to the male applicants for the same position; the make-up of the Board at that time; or any details concerning the selection process. See Lee v. GTE Fla., Inc., 226 F.3d 1249, 1255 n.2 (11th Cir. 2000) (plaintiff's contention that employer failed to offer a position to females was statistically meaningless where there was no evidence of relative qualifications with respect to male candidates or of a context against which to measure the facts alleged), cert. denied, 532 U.S. 958, 121 S. Ct. 1486, 149 L. Ed. 2d 374 (2001).

At bottom, there is simply no evidence from which a reasonable juror could conclude that the Board's decision not to hire Battle for director of schools was a pretext for gender discrimination. As there is insufficient evidence to create a genuine issue of material fact that the Defendant's articulated reasons were pretextual, her Title VII discrimination claim must fail.

Retaliation.

---

[7]Curiously, the Plaintiff offers no argument relative to the male candidate recommended by TSBA. If Garrett were attempting to avoid hiring a female for the position, he need not have looked further than Cedrick Gray. See Catanzaro v. Oakland Cnty. Cmty. Coll., No. 06-10338, 2007 WL 142158, at *6 (E.D. Mich. Jan. 16, 2007) (in determining pretext had not been shown in a reverse discrimination case where plaintiff alleged less qualified females without Ph.Ds were hired instead of him, court noted that plaintiff had failed to address the fact that women with Ph.Ds were also not hired).

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice" under the statute. 42 U.S.C. § 2000e-3(a). Similarly, the THRA prohibits "discriminat[ion] in any manner against a person because such person has opposed a practice declared discriminatory" under the THRA. Tenn. Code Ann. § 4-21-301(1). "A plaintiff must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of" the anti-discrimination statutes. Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009), *reh'g denied* (Mar. 27, 2009). "[A] violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful." Johnson v. University of Cincinnati, 215 F.3d 561, 579-80 (6th Cir.), *cert. denied*, 531 U.S. 1052, 121 S. Ct. 657, 148 L. Ed. 2d 560 (2000).

> To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action.

Barrett, 556 F.3d at 516; *see also* Ayala v. Summit Constructors, Inc., ___ F. Supp. 2d ___, 2011 WL 1560912, at *9-10 (M.D. Tenn. Apr. 25, 2011) (noting that the same standard applies to retaliation claims asserted under the THRA).

The basis for Battle's retaliation claim is that, following Mr. King's selection as director of schools, she complained to Board member Thornton and, shortly thereafter, was informed that King had restructured the school system's organizational chart resulting in a diminishment of her role and stature in the district and the community. In her response to the motion for summary judgment, she avers that she opposed the Board's action in hiring a male and that, as a consequence, was moved

38

down in the system's structure. There is no evidence, however, that the restructuring was in retaliation for her engaging in activity protected under the anti-discrimination statutes when she complained to Thornton. In the rather lengthy telephone conversation taped by the Plaintiff, she never once mentioned to Thornton that she believed the Board's choice had anything whatever to do with her gender. Instead, she pointed only to the fact that certain persons in the community did not like her and wanted revenge against her. Thus, she could not in good faith have believed that the Board's failure to hire her as director of schools was because she opposed gender discrimination.[8]

*CONCLUSION*

For the reasons articulated herein, the motion for summary judgment is GRANTED.[9]

IT IS SO ORDERED this 12th day of October 2011.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[8]Nor has it been shown, for that matter, that King was aware of her complaints to Thornton or that the Board had any role in the restructuring.

[9]The Plaintiff's recent motion to have certain facts deemed admitted is moot. Even construing the alleged facts referred to in her motion as true, she cannot survive summary judgment.